United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY T. DAVIS,

              Petitioner,

    v.

D.L. RUNNELS, Warden,
High Desert State Prison,

              Respondent.

_____/

No. C 02-0538 PJH

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

      Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed pro se by state prisoner, Anthony T. Davis ("Davis"), who is now represented by counsel.  Having reviewed the parties' papers, the record, and having carefully considered their arguments and the relevant legal authorities, the court hereby DENIES the petition.

<b>BACKGROUND</b>

**I.    Procedural History**

      On July 16, 1998, Davis was convicted by a jury of one count of assault with a deadly weapon under California Penal Code § 245, subdivision (a)(1), with great bodily injury under California Penal Code § 12022.7, subdivision (a), resulting from a violent altercation with his girlfriend.  Subsequently, on July 20, 1998, the state trial court found that Davis had two prior convictions qualifying as "strike" priors within the meaning of Penal Code §§ 667, subdivisions (d)-(e) and 1170.12, subdivisions (b)-(c).

      On October 9, 1998, the state trial court denied Davis' motion for a new trial.  Davis then retained a new attorney and filed a second motion for a new trial based on ineffective assistance of counsel.  On December 23, 1998, the trial court denied Davis' second motion.  Thereafter, on January 11, 1999, the court sentenced Davis to a total prison term of 38

years to life under California's three strikes law (Ca. Pen. Code § 667, subd. (b)-(i)).

On November 13, 2000, the California Court of Appeal affirmed Davis' conviction in an unpublished decision.  Davis filed a petition for review in the California Supreme Court on December 22, 2000, which the court summarily denied on February 21, 2001.  Davis filed the instant federal habeas petition on January 30, 2002.

**II.    Factual History**

Davis' conviction stems from the following facts, a more extensive summary of which may be found in the state appellate court's decision.  *See* Exh. F.

On February 1, 1998, at approximately 3:00 a.m., Davis struck his girlfriend (now wife), Ella Alexander ("Alexander"), with a hammer on the top right side of her head, resulting in a depressed skull fracture.  At trial, Davis admitted to inflicting the injury. However, the circumstances surrounding the injury were at issue for the jury – specifically, whether Davis acted as the aggressor or whether the injury was inflicted by accident or in self-defense.

No one present at the time of the incident testified at trial.  The victim, Alexander, was subpoenaed on several occasions, but refused to testify.  The victim's mother, Gloria Persons ("Persons"), the only other person present at the time of the incident, also did not testify at trial.

However, the jury heard evidence regarding numerous conflicting out-of-court statements made by both Alexander and her mother, Persons, at different points in time to various people, including law enforcement officers, regarding the events surrounding the altercation.  These included Officer Salazar, who testified that, upon arriving at the scene, Alexander, who was fading in and out of consciousness, stated that her boyfriend, Davis, had struck her with a hammer.  She further stated that before Davis hit her, he made the comment, "All right, Bitch, I got something for you."

Alexander's mother, Gloria Persons, who was present at the residence when the incident occurred, reported to police immediately after the incident that she was upstairs when she heard Davis and Alexander arguing.  Persons then heard a slap and heard her

**United States District Court**
For the Northern District of California

1   daughter cry out for her to call the police.  Persons went downstairs, where she saw Davis

2   and Alexander arguing.  Persons tried to separate them.  Persons then witnessed Davis

3   push Alexander onto the couch and hit her in the head with a hammer.  Persons called 911,

4   and attempted to stop the bleeding from Alexander's head.

5          The morning following the incident, while at the hospital, Alexander stated in a tape-

6   recorded interview to another officer, Sergeant Sanford, that she had been arguing with

7   Davis.  She asserted that she had a knife that she intended to use to scare Davis, and that

8   she pulled the knife on Davis before she saw the hammer.  According to Alexander,

9   immediately after Davis inflicted the blow with the hammer, he stated, "Oh my God," and

10  ran out of the house.

11         Shortly before Davis' trial commenced, Alexander gave a conflicting statement to

12  defense investigator Nigel Phillips, in an effort to exonerate Davis.  At trial, Phillips testified

13  that Alexander stated that: (1) after consuming a large quantity of alcohol, she and Davis

14  got into an argument; (2) at one point, she went into the kitchen and got three knives; (3)

15  when the argument resumed, she used the knives, one in each hand, to slash at Davis'

16  face and neck; (4) Davis grabbed a hammer and tried to defend himself by using it to knock

17  the knives out of her hands; and (5) during the ensuing melee, the hammer then accidently

18  slipped and hit her on the head.

19         In addition, the jury heard evidence that several months following the incident,

20  Alexander called the District Attorney's Office and indicated that she wanted to drop the

21  charges against Davis, claiming that the incident had been a drunken accident.  She

22  refused to provide further details.

23         The prosecution presented testimony from Dr. Grant Gauger, acting chief of

24  neurosurgery at San Francisco General Hospital and associate clinical professor at the

25  University of California, to dispel the possibility that the injury was an accident.  Gauger

26  testified that a controlled, guided blow with considerable force is required to break the skull,

27  and such an injury would unlikely result from a hammer "slipping" from someone's hand.

28  The prosecution further undercut Davis' self-defense claim, arguing that given Alexander's

physical size of five feet ten inches tall and 225 pounds, and given the fact that the injury was inflicted at the very top of her skull, she would have had to have been sitting down at the time of the injury.

## ISSUES

In his petition before this court, Davis alleges the following violations of his constitutional rights, four of which concern alleged violations of the Sixth Amendment's Confrontation Clause:

(1)   That he received ineffective assistance of counsel when his court-appointed attorney failed to investigate evidence that Davis' hand was allegedly cut by Alexander in support of his self-defense theory; and

(2)   California Evidence Code § 1370 is facially unconstitutional and violates the Confrontation Clause of the Sixth Amendment;

(3)   application of California Evidence Code § 1370 to Davis violated the Confrontation Clause;

(4)   the Confrontation Clause was violated when Persons' and Alexander's hearsay statements to Officer Salazar were admitted as spontaneous statements;

(5)   the Confrontation clause was violated when the state trial court denied Davis' motion for a new trial, based on "newly discovered" evidence that demonstrated that Alexander and Persons contrived to misrepresent the incident in order to protect Alexander from criminal charges;

(6)   that the alleged cumulative errors denied him a fair trial.

### A.    Further Exhaustion Proceedings

As noted, Davis filed his pro se federal habeas petition on January 30, 2002. On August 13, 2002, the court denied Davis' request to appoint counsel, finding that because Davis' claims were not particularly complex and because he had presented them adequately in his petition, appointment of counsel was not warranted under 18 U.S.C. § 3006A(a)(2)(B).  The state subsequently filed an opposition and Davis a traverse, and the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    instant federal habeas petition was fully briefed on November 15, 2002.

2         However, on March 8, 2004, prior to the court's issuance of a decision on the merits,

3    the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004).

4    The *Crawford* Court held that the Confrontation Clause forbids admission in a criminal trial

5    of an out-of-court testimonial statement by a witness who does not testify, unless the

6    witness is both unavailable and the defendant had a prior opportunity to cross-examine,

7    abrogating the "reliability" test set forth previously by the Court in *Ohio v. Roberts*, 448 U.S.

8    56, 65 (1980). *Crawford*, 541 U.S. at 68-69. Thereafter, on April 19, 2004, the court

9    appointed counsel in this case for the limited purpose of providing supplemental briefing on

10   both the retroactivity of *Crawford*, and its potential effect on Davis' Confrontation Clause

11   claims. Federal Public Defender David Fermino was appointed as Davis' counsel. The

12   parties completed supplemental briefing on the *Crawford* issues on August 19, 2004.

13   However, as the court noted in a subsequent order issued March 8, 2005, the parties'

14   briefing primarily covered the issue of *Crawford's* retroactivity, as opposed to the merits of

15   Davis' claims under *Crawford.*

16        Subsequently, though, on February 22, 2005, the Ninth Circuit decided *Bockting v.*

17   *Bayer*, 399 F.3d 1010 (9th Cir. 2005), and concluded that *Crawford* applied retroactively to

18   cases on collateral review. Following the Ninth Circuit's decision, on March 8, 2005, this

19   court held the instant habeas proceedings in abeyance in order to afford the state courts

20   the opportunity to re-examine Davis' Confrontation Clause claims in light of the Supreme

21   Court's decision in *Crawford*, and the Ninth Circuit's decision in *Bockting* that *Crawford*

22   should be applied retroactively to the instant case.

23        Based primarily on former appointed counsel's failure to timely file a habeas petition

24   on Davis' behalf in the state courts, on November 1, 2005, this court vacated Mr. Fermino's

25   appointment, and appointed Davis' current counsel, Michael Thorman. Thorman thereafter

26   sought habeas relief on Davis' behalf in the state courts. He filed a state habeas petition

27   with the superior court on December 22, 2005, which the court subsequently denied. Davis

28   then sought habeas relief in the California Supreme Court, which, in a postcard denial,

1   denied review on March 14, 2007.  On March 27, 2007, Davis advised this court of the final

2   state court decision.  The court subsequently ordered the parties to show cause why the

3   matter should not be finally adjudicated.

4        On April 6, 2007, Davis, responding to the court's OSC, sought leave to have

5   counsel supplement the original briefing on his claims.  On April 9, 2007, the court ruled

6   that supplemental briefing was neither helpful nor necessary, noting the United States

7   Supreme Court's recent decision in *Whorton v. Bockting*, 127 S.Ct. 1173 (Feb. 28, 2007), in

8   which the Court held that *Crawford* does not apply retroactively.  Accordingly, the court

9   noted that because Davis' Confrontation Clause claims are therefore governed by *Ohio v.*

10  *Roberts*, 448 U.S. 56, 65 (1980), a case in effect at the time of the prior completion of

11  briefing, further briefing would be of no assistance.  *See Bolton v. Knowles*, 2007 WL

12  793200 at *1 (9th Cir. 2007) (noting that habeas petitioner's Confrontation Clause claim is

13  governed by the standards set forth in *Ohio v. Roberts*); *accord Miller v. Fleming*, 2007 WL

14  840981 (9th Cir. 2007).

**STANDARD OF REVIEW**

16       This court may entertain a petition for writ of habeas corpus "on behalf of a person

17  in custody pursuant to the judgment of a state court only on the ground that he is in custody

18  in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

19  2254(a).  Because the petition in this case was filed after the effective date of the

20  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act

21  apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district

22  court may not grant a petition challenging a state conviction or sentence on the basis of a

23  claim that was reviewed on the merits in state court unless the state court's adjudication of

24  the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

25  application of, clearly established Federal law, as determined by the Supreme Court of the

26  United States; or (2) resulted in a decision that was based on an unreasonable

27  determination of the facts in light of the evidence presented in the State court proceeding."

28  28 U.S.C. § 2254 (d).

United States District Court

For the Northern District of California

1    A state court decision is "contrary to" Supreme Court authority, falling within the first

2    clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

3    reached by [the Supreme] Court on a question of law or if the state court decided a case

4    differently than [the Supreme] Court has on a set of materially indistinguishable facts."

5    Williams v. Taylor, 529 U.S. 362, 412-413 (2000).  "Clearly established Federal law" under

6    § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

7    the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72

8    (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

9    [Supreme] Court decisions as of the time of the relevant state court decision."  Id.

10    "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

11    may grant the writ if the state court identifies the correct governing legal principle from [the

12    Supreme] Court's decisions but unreasonably applies that principle to the facts of the

13    prisoner's case."  Id. at 1174.  However, this standard "requires the state court decision to

14    be more than incorrect or erroneous."  Id.  For the federal court to grant habeas relief, the

15    state court's application of the Supreme Court authority must be "objectively unreasonable."

16    Id. at 1174-1175.  The "objectively unreasonable" standard is different from the "clear error"

17    standard in that "the gloss of clear error fails to give proper deference to state courts by

18    conflating error (even clear error) with unreasonableness."  Id. at 1175; see also Clark v.

19    Murphy, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

20    court, in its independent review of the legal question, is left with a firm conviction that the

21    state court was erroneous . . . Rather, the habeas court must conclude that the state court's

22    application of federal law was objectively unreasonable."  Andrade, 538 U.S. at 75; see

23    also Clark, 331 F.3d at 1068.

24    As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

25    habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

26    state court resulted in a decision that was based on an unreasonable determination of the

27    facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

28    2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

**United States District Court**
For the Northern District of California

1    determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

2    determining the "unreasonable determination of facts in light of the evidence" under §

3    2254(d)(2). *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000). To grant

4    relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

5    determination made by the state court was wrong and that the one [petitioner] urges was

6    correct." *Id.* at 1108.

7        However, when the state court decision does not articulate the rationale for its

8    determination or does not analyze the claim under *federal* constitutional law, a review of

9    that court's application of clearly established federal law is not possible. *See Delgado v.*

10    *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, Federal

11    Habeas Corpus Practice and Procedure § 32.2, at 1424-1426 & nn. 7-10 (4th ed. 2001).

12    When confronted with such a decision, a federal court must conduct an independent review

13    of the record and the relevant federal law to determine whether the state court's decision

14    was "contrary to, or involved an unreasonable application of, "clearly established federal

15    law." *Delgado*, 223 F.3d at 982.

16        When a state court does not furnish a basis for its reasoning, we have no
17        basis other than the record for knowing whether the state court correctly
       identified the governing legal principle or was extending the principle into a
18       new context. . . .[A]lthough we cannot undertake our review by analyzing the
       basis for the state court's decision, we can view it through the 'objectively
19       reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
       review is not de novo when the state court does not supply reasoning for its
20       decision, but an independent review of the record is required to determine
       whether the state court clearly erred in its application of controlling federal
21       law. . . . Only by that examination may we determine whether the state
       court's decision was objectively reasonable.

22 *Id.*

### DISCUSSION

23

24 **I.    Davis was not Denied Effective Assistance of Counsel**

25        Davis asserts that he was denied effective assistance of counsel based on his

26    counsel's alleged failure to investigate evidence that his hand was cut by Alexander during

27    the incident at issue, in support of his self-defense claim.

       On December 23, 1998, the state trial court heard Davis' second motion for a new

28

trial, based on the same ineffective assistance of counsel claim.  In the trial court, Davis

claimed that his former trial counsel, Mr. Leland Davis ("counsel"): (1) failed to investigate

the victim, Alexander's propensity for violence; (2) failed to investigate a cut on Davis' hand

allegedly inflicted by Alexander; and (3) failed to object during the prosecutor's allegedly

improper closing argument.   In the instant habeas petition, as in his state court appeal,

Davis claimed ineffective assistance of counsel solely on the basis that his counsel failed to

investigate the cut on Davis' hand allegedly inflicted by Alexander.  Accordingly, this court

limits its discussion to that issue.

At the December 23, 1998 hearing before the trial court, Davis testified that he had

informed his attorney that Alexander inflicted a cut to his hand during the altercation.  Davis

further asserted that he informed his attorney that several people observed the cut,

including his mother, Yvonne McGregor; his aunt, Drucilla Davis; his grandmother; his

cousin, Thomas Redwood; and his cousin's girlfriend, Rachelle Martin.  According to Davis,

his attorney did not inquire further regarding the cut; nor did counsel inquire regarding the

existence of related medical records.  Davis contended that his counsel merely informed

him that he had been in contact with Davis' family members.

Davis also testified that his attorney did not request the identities of non-family

members who may have observed the cut; as a result, Davis explained that he did not

volunteer the information.  Davis contended that he assumed the cut was not relevant since

his attorney did not question him about it.  Davis, however, conceded that he had in fact

signed a declaration affirming that, at the time of trial, his attorney asked him if there were

any witnesses he wanted to call, and that he had responded that there were none.

Several people testified on Davis' behalf at the hearing on the motion for a new trial,

including Davis' cousin, Redwood; his cousin's girlfriend, Martin; his aunt, Drucilla Davis;

and Alexander.[1]  Redwood testified that Davis had been present at his house in February

_____

[1] Davis' mother, McGregor, and his sister, Carla Minnick, also testified at the hearing
regarding the additional ineffective assistance claims made by Davis.  A discussion of their
testimony is not discussed here as the claims were not included in the federal habeas petition.

9

United States District Court

For the Northern District of California

1    1998, and had a cut on the palm of his right hand by his thumb for which Redwood gave

2    Davis a bandage.  Redwood testified that Davis' attorney never contacted him.

3          Redwood's girlfriend, Martin, likewise testified that she observed a cut on Davis'

4    hand.  She stated that Davis requested a bandage on two separate occasions, which she

5    believed to have been approximately one or two days after Alexander was hit on the head.

6    Martin testified that she was unsure where on Davis' hand the cut was located, but believed

7    it was inside or around Davis' finger or palm area.

8          Drucilla Davis, Davis' aunt, also testified that she saw Davis in February soon after

9    the incident, at which time he had a cut on his palm.  She asserted that she was not

10   contacted by Davis' attorney or anyone in his office.

11         The victim, Alexander, testified at the hearing that prior to Davis' trial, Davis' attorney

12   and a woman named Silver Jones interviewed her regarding the incident.  Alexander

13   claimed to have stated at that interview that, on the night of the incident, she was in

14   possession of multiple knives with which she "went after" Davis.  She also allegedly stated

15   to counsel and Jones that she picked up the knives because she and Davis were arguing

16   and she was intoxicated.  Alexander believed that she cut Davis on the hand, but did not

17   actually see the cut.  Alexander further testified that she had substantial contact with Davis'

18   attorney, but that he did not ask her to testify at trial, and that he, in fact, advised her that if

19   she came to trial, she would be taken to jail.

20         Davis' counsel, Leland Davis, also testified at the hearing.  Counsel testified that he

21   spoke to Davis over the phone and in person a total of thirty times, and that he paid very

22   close attention to Davis' case because it was a three strikes case.  Counsel attested that in

23   response to Davis' repeated mention of the cut on his hand, he made several inquiries as to

24   whether Davis had, at the time, sought medical attention, shown the cut to anyone, or taken

25   pictures of the cut.  According to counsel, Davis responded to these inquiries negatively,

26   asserting that there were no witnesses.  Counsel also testified that, in spite of very open

27   _____

28

10

United States District Court
For the Northern District of California

conversations, Davis made no mention of Drucilla Davis, Martin, or Redwood.  Counsel further stated that no one contacted him before or after the trial with information; nor did Davis ask him to contact anyone else.

Finally, counsel denied instructing Alexander to ignore the prosecution's subpoena and not to testify, but, instead, testified that he advised her to contact the prosecutor.  He stated that he made a tactical decision not to subpoena Alexander because he did not believe she would be a credible witness, and he feared negative information that could be revealed on cross-examination, such as her propensity for lying and history of drinking and violence.

The trial court subsequently denied Davis' second motion for a new trial, finding that counsel was not ineffective and had adequately presented Davis' self-defense claim to the jury.  The trial court also found that: (1) the only names of potential witnesses that Davis gave counsel were those of his mother and sister; (2) counsel contacted and interviewed those potential witnesses; and (3) counsel inquired fully on the question of Davis' alleged cut.

The state appellate court affirmed the trial court's denial of Davis' second motion for a new trial and its conclusion that counsel was not ineffective.  The California Court of Appeal deferred to the trial court's findings that: "[T]here [was] direct evidence that [counsel] inquired fully on the question of the cut, the witnesses to it," and that Davis did not provide counsel with the name of additional witnesses until "after the conviction by the jury."  The state appellate court concluded that "the record reveal[ed] [Davis'] claim of self-defense was investigated, and presented in an effective manner."

A claim of ineffective assistance of counsel is cognizable as a claim for denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any such claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*

11

**United States District Court**
For the Northern District of California

1    In order to prevail on a Sixth Amendment ineffective assistance of counsel claim,

2    Davis must establish two things.  First, he must establish that counsel's performance was

3    deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing

4    professional norms.  *Strickland*, 466 U.S. at 687-88.  This requires showing that counsel

5    made errors so serious that counsel was not functioning as the "counsel" guaranteed by the

6    Sixth Amendment.  *See Strickland*, 466 U.S. at 687.  Second, Davis must establish that he

7    was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable

8    probability that, but for counsel's unprofessional errors, the result of the proceeding would

9    have been different." *Id.* at 694.  Davis must show that counsel's errors were so serious as

10   to deprive him of a fair trial.  *Strickland*, 466 U.S. at 688.  A reasonable probability is a

11   probability sufficient to undermine confidence in the outcome.  *Id.*

12   Davis challenges his trial counsel's alleged failure to investigate adequately and

13   present potential defense witnesses with respect to his self-defense claim.  "A lawyer who

14   fails adequately to investigate, and to introduce into evidence, records that demonstrate his

15   client's factual innocence, or that raise sufficient doubt as to that question to undermine

16   confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067,

17   1070 (9th Cir. 1999).

18   Federal law is clear that the duty to investigate and prepare a defense does not

19   require that every conceivable witness be interviewed.  *Hendricks v. Calderon*, 70 F.3d

20   1032, 1040 (9th Cir. 1995).  A claim of failure to interview a witness cannot establish

21   ineffective assistance when the person's account is otherwise fairly known to defense

22   counsel.  *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).  When the record

23   shows that the lawyer was well-informed and the defendant fails to state what additional

24   information would be gained by the discovery he now claims was necessary, an ineffective

25   assistance claim fails.  *Id.*  A defendant's mere speculation that a witness might have given

26   helpful information if interviewed is not enough to establish ineffective assistance.  *See*

27   *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001).

28   Counsel's decision not to present evidence regarding Davis' cut constituted a

United States District Court
For the Northern District of California

1   reasonable tactical decision.  The state court reasonably found, based on the evidence

2   before it, that counsel "made a decision consistent with the *Strickland* case, that the

3   consequences of presenting . . . the conduct of [Alexander] would open the door [under

4   state evidentiary rules]."  The state court further noted that counsel

5       was very much concerned about that and its consequences.  And it seems
        objectively appropriate for a lawyer with experience to be concerned about
6       that consequence in a case such as this, where self-defense was involved.

7   R.T. 602.  The state court concluded that it found "no need to second-guess the

8   appropriateness of [counsel's] choices under the evidence that is before this court."  *Id.*

9       This ruling comports with federal law.  The relevant inquiry is not what defense

10  counsel could have done, but whether the choices defense counsel made were reasonable.

11  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).   A difference of opinion as to

12  trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*,

13  646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions do not constitute ineffective

14  assistance simply because in retrospect better tactics are known to have been available.

15  *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984); *see also Brodit v. Cambra*, 350

16  F.3d 985, 994 (9th Cir. 2003) (state court reasonably concluded that trial attorney provided

17  effective assistance of counsel where attorney declined to present evidence favorable to

18  defense out of concern that it would open door to unfavorable evidence).

19      Here, the record demonstrates that counsel's tactical decisions deserve deference

20  because: (1) counsel based his trial conduct on strategic considerations; (2) counsel made

21  an informed decision based upon investigation; and (3) the decision appears reasonable

22  under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

23  Accordingly, this court concludes that the state appellate court's affirmance of the trial

24  court's determination regarding ineffective assistance was not unreasonable.

25      Moreover, Davis is likewise unable to demonstrate prejudice.  "[I]neffective

26  assistance claims based on a duty to investigate must be considered in light of the strength

27  of the [State's] case."  *Eggleston*, 798 F.2d at 376.  Davis is unable to establish that there is

28  a reasonable probability that but for counsel's failure to investigate and present evidence

1    from other witnesses, the result of the trial would have been different.  *See Strickland*, 466

2    U.S. at 694.  Based on the record before it, this court concludes that the trial court correctly

3    found, and the state appellate court reasonably affirmed, that "the defense of self-defense

4    was presented to the jury" and "was argued vigorously by [Davis'] lawyer."  R.T. 600.

5    Counsel's arguments and the jury instructions "provide[d] a full legal narrative of the

6    contours of [Davis'] self-defense claim."  *Id.*

7        Accordingly, Davis' ineffective assistance claim fails.

8    **II.    Confrontation Clause Claims**

9        As set forth above, Davis also raises four claims related to alleged violations of the

10   Sixth Amendment's Confrontation Clause.  These claims relate to the state trial court's

11   admission of out-of-court statements from the victim, Alexander, and her mother, Gloria

12   Persons.

13       **A.    Legal Standards**

14       The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

15   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

16   against him."  U.S. Const. amend. VI.  In *Ohio v. Roberts*, the Supreme Court set forth a

17   general framework by which to determine whether admission of hearsay statements meets

18   the requirements of the Confrontation Clause.  448 U.S. at 66.  Under the *Roberts*

19   framework, a hearsay statement is admissible if the prosecution shows that the declarant is

20   unavailable and that the statement has adequate "indicia of reliability."  *Id.*  However,

21   subsequently in *White v. Illinois,* the Supreme Court held that unavailability analysis is a

22   necessary part of the Confrontation Clause inquiry only when the challenged out-of-court

23   statements were made in the course of a prior judicial proceeding.  502 U.S. 346, 354

24   (1992) (citing *United States v. Inadi*, 475 U.S. 387, 392-94 (1986)) (concluding that

25   "*Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court

26   statement can be introduced by the government without a showing that the declarant is

27   unavailable"); *accord Whelchel v. Washington*, 232 F.3d 1197, 1208 (9th Cir. 2000).

28       "Reliability can be inferred without more in a case where the evidence falls within a

14

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   firmly rooted hearsay exception," or if the evidence contains "particularized guarantees of

2   trustworthiness." *Id.* "The 'particularized guarantees of trustworthiness' required for

3   admission under the Confrontation Clause must . . . be drawn from the totality of

4   circumstances that surround the making of the statement and that render the declarant

5   particularly worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 820 (1990).

6          As noted, after this case was fully briefed, the United States Supreme Court held

7   that the Confrontation Clause forbids admission in a criminal trial of an out-of-court

8   testimonial statement by a witness who does not testify, unless the witness is both

9   unavailable and the defendant had a prior opportunity to cross-examine her. *Crawford*, 541

10  U.S. at 68-69.  However, the Supreme Court subsequently clarified that *Crawford* does not

11  apply retroactively to this habeas case. *Whorton v. Bockting*, 127 S.Ct. at 1173.

12         **B.     General Background re: Confrontation Clause Claims**

13         Alexander gave two separate statements to officers soon after the incident that were

14  admitted by the trial court.  The first statement was made to Officer Salazar, who

15  responded to the 911 call the morning of the incident.  Upon arriving at Alexander's

16  apartment, Officer Salazar observed Alexander lying face-down in a pool of blood.  When

17  he questioned her regarding what happened, Alexander told Salazar that her boyfriend,

18  Davis, hit her in the head with a hammer.  The trial court admitted Alexander's first out-of-

19  court statement under the spontaneous declaration exception to the state hearsay rule.

20  *See* Cal. Evid. Code § 1240.

21         Alexander gave the second out-of-court statement admitted into evidence the

22  morning after the incident, when she was in the hospital.  In the course of an interview with

23  Officer Sanford, Alexander stated again that Davis hit her over the head with a hammer.

24  The trial court allowed the prosecution to introduce the second statement in rebuttal to

25  defense testimony suggesting that the incident was an accident pursuant to California

26  Evidence Code § 1370.

27         The trial court also admitted two out-of-court statements made by Alexander's

28  mother, Persons, as spontaneous declarations pursuant to California Evidence Code §

15

United States District Court
For the Northern District of California

1  1240.  These statements included the tape of Person's 911 call, and her statements at the

2  scene to Salazar.

3          **C.**     **California Evidence Code Section 1370 Claims**

4         Davis challenges California Evidence Code § 1370, pursuant to which Alexander's

5  statement to Sanford was admitted, on two grounds.  First, he contends that the section is

6  facially unconstitutional.  Second, he claims that § 1370, as applied by the trial court, was

7  unconstitutional.

8             **i.**     **Background**

9         On July 9, 1998, more than five months after the incident, defense investigator Nigel

10  Phillips interviewed Alexander by telephone.  Phillips testified at trial that, at the time of the

11  telephone interview, Alexander asserted that she wanted to change her prior story

12  regarding the circumstances surrounding the February 1, 1998 incident.  R.T. 57.

13  Alexander told Phillips that on the day in question, she and Davis had an argument after

14  they had both been consuming large amounts of alcohol.  In the midst of the argument,

15  Davis went upstairs, and Alexander went into the kitchen and obtained three knives, two of

16  which she placed in her belt loops, and one in her socks.  *Id.* at 58.

17         The argument resumed when Davis returned downstairs, and Alexander alleged that

18  she began thrashing the knives at Davis' face and neck.  Alexander asserted that, at the

19  time she began thrashing the knives, Davis had nothing in his hands.  *Id.* at 58-59.

20  Phillips testified that Alexander stated that Davis then grabbed a hammer in an attempt to

21  defend himself and to knock the knives from Alexander's hands.  *Id.*  In the melee,

22  Alexander claimed that the hammer slipped and hit her on the head, causing her injury.

23         Following Phillips' testimony regarding Alexander's later statements, the trial court

24  permitted testimony from San Francisco Police Sergeant John Sanford, Jr. based on his

25  tape-recorded interview with Alexander the morning after the incident while she was at the

26  hospital.  The court allowed introduction of Alexander's statement to Sanford to rebut her

27  statements to Phillips, pursuant to California Evidence Code § 1370, which provides in

28  pertinent part:

§ 1370 Infliction of Injury

(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:

   (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

   (2) The declarant is unavailable as a witness pursuant to Section 240.

   (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.

   (4) The statement was made under circumstances that would indicate its trustworthiness.

   (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.

(b) For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:

   (1) Whether the statement was made in contemplation of pending or anticipated litigation in which declarant was interested.

   (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

   (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section.

Sanford testified that Alexander told him that she received the injury when Davis hit her over the head with a hammer earlier that morning. She stated that she and Davis had been drinking that night and that they were arguing in the living room prior to her injury. She told Sanford that Davis would not leave her alone, even though she continued to ask him to do so. According to Alexander, Davis went upstairs and returned with a hammer. R.T. 113. He advised Alexander that he was tired of her "clowning him," and advised Alexander, while holding the hammer, that "before I leave, I'm going to do something else." R.T. 115.

In her statement to Sanford, Alexander acknowledged that at some point she did have a knife "[j]ust to scare him because I know he was . . . gonna . . . get in my face." R.T. 117-18. She admitted pulling the knife on Davis prior to seeing the hammer. *Id.* According

17

1   to Alexander, Davis reached for a cigarette, and she slapped it out of his hand.  Sanford

2   recalled Alexander telling him she was sitting on the couch when she was hit with the

3   hammer.  After Davis hit Alexander, he said, "Oh, my God," and ran out of the house.

4   According to Alexander, her mother was upstairs at the time of the assault.

5                          **ii.    Facial Constitutionality**

6          Davis argues that section 1370 is unconstitutional on its face because it violates the

7   Confrontation Clause of the Sixth Amendment.

8          Section 1370 was enacted in 1996 in response to the exclusion of Nicole Brown

9   Simpson's diary in the O.J. Simpson trial in 1994-95.  It permits the admission of a hearsay

10  statement pertaining to the infliction of physical injury on the declarant if the declarant is

11  unavailable as a witness and the statement was made under circumstances that guarantee

12  its trustworthiness.

13         The state appellate court concluded that section 1370 was facially constitutional

14  based on a pre-*Crawford* California Court of Appeal decision, *People v. Hernandez.  See*

15  71 Cal.App.4th 417, 424 (Cal. Ct. App. 1999).  Because the court agreed that section 1370

16  was "closely akin to the 'firmly rooted' Evidence Code section 1240 'spontaneous

17  statement' hearsay exception," and "contains particularized guarantees of trustworthiness

18  and adequate indicia of reliability," the California Court of Appeal concluded that section

19  1370 was not facially unconstitutional.  *See id.*

20         Here, because Davis' Confrontation Clause claims are governed by the federal law

21  in effect prior to *Crawford,* the court must evaluate the constitutionality of section 1240

22  under pre-*Crawford* law.[2]   The court concludes that the state appellate court's decision was

23  _____

24         [2]The Supreme Court's decision in *Crawford* called into question the continued validity
    of the pertinent reasoning in the *Hernandez* decision, relied on by the state appellate court.
25  *See People v. Kilday*, 20 Cal.Rptr.3d 161, 168-69 (Cal.Ct.App. 2004) (without deciding issue,
    noting that *Crawford* requires a different analysis regarding the facial constitutionality of statute
26  than that utilized by court in *Hernandez*, which relied on *Roberts*).  However, post-*Crawford*,
    the California courts have held that: "Construing section 1370 of the Evidence Code along with
27  *Crawford*, we interpret the trustworthiness prong of subdivision (a)(4) of that statute to require
    a prior opportunity to cross-examine the declarant."  *See, e.g., People v. Price*, 15 Cal.Rptr.3d
28  229, 238-39 (Cal. Ct. App. 2004).

                                      18

United States District Court

For the Northern District of California

1   reasonable because the evidence admissible under the statute contains sufficient "indicia of

2   reliability," as determined by applicable federal law.  First, the statute recognizes the

3   admissibility of evidence similar to that deemed admissible by the excited utterance, and

4   statements to obtain medical treatment or diagnosis, exceptions to the hearsay rule, *see*

5   Federal Rules of Evidence 803(2) and 803(4), both of which the Supreme Court has

6   suggested are "firmly rooted" exceptions.  *See White*, 502 U.S. at 355-56 & n. 8 (noting

7   that spontaneous declarations "are made in contexts that provide substantial guarantees of

8   their trustworthiness" and also that "[a] statement that has been offered in the moment of

9   excitement - without the opportunity to reflect on the consequences of one's exclamation -

10  may justifiably carry more weight"); *see also People of the Territory of Guam v. Cepeda*, 69

11  F.3d 369, 373 (9th Cir. 1995) (noting that excited utterance hearsay exception is "firmly

12  rooted" for purposes of the Confrontation Clause).

13         Additionally, section 1370 contains several provisions designed to provide

14  "particularized guarantees of trustworthiness."  First, the statute requires that the statement

15  concern the personal injury of the declarant, thus ensuring that it is within the personal

16  knowledge of the declarant.  *See People v. Kons*, 133 Cal.Rptr.2d 520, 525 (Cal. Ct. App.

17  2003).  Second, the timing provision of the statute requires that the statement be made at

18  or near the time of the trauma or threat of infliction, which increases the statement's

19  reliability by reducing the time for reflection.  *Id.*  Furthermore, the fact that the statement

20  must be made in writing and/or recorded electronically only to medical personnel or law

21  enforcement also encourages the declarant to speak truthfully "on the record."  *Id.*  Finally,

22  the statute also specifically requires that the statement be made under trustworthy

23  circumstances, and delineates several examples of such circumstances.  *Id.*

24         For these reasons, Davis' claim fails.

25              **iii.    Constitutionality as Applied**

26         Davis also contends the trial court applied section 1370 unconstitutionally to him by

27  admitting Alexander's statements.  He claims that the trial court improperly found that

28  Alexander was unavailable and erred in finding that her statements were made under

19

United States District Court

For the Northern District of California

1    circumstances that guaranteed trustworthiness.

2                              **a.    Unavailability**

3           As noted above, because Alexander's statements that were admitted pursuant to

4    section 1370 were not made in the course of a prior judicial proceeding, unavailability

5    analysis is not a necessary part of the Confrontation Clause inquiry with respect to this

6    issue. *See White*, 502 U.S. at 741 (noting that "*Roberts* stands for the proposition that

7    unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the

8    challenged out-of-court statements were made in the course of a prior judicial proceeding").

9    Nevertheless, even if unavailability was at issue, the court would conclude that the state

10   appellate court's determination that Alexander was unavailable was reasonable.

11          Alexander was served with a subpoena for the original trial date by an investigator

12   for the district attorney's office.  Subsequently, on June 17, 1998, assistant district attorney

13   Anthony Brass personally served Alexander with a second subpoena for the same trial

14   date.  Thereafter, on June 26, 1998, Alexander was arrested at her residence, the same

15   residence where the incident occurred, on a body attachment, which the district attorney

16   sought and obtained because Alexander had previously indicated that she did not want to

17   prosecute the case.  The district attorney authorized her release based on Alexander's

18   promise to appear at trial.  She failed to appear on the date set for trial.

19          In addition to these efforts, the district attorney also attempted to compel Alexander's

20   appearance by conducting "checks" on her residence.  He had investigators personally

21   check her residence on nearly a dozen occasions, and telephoned her regularly until her

22   phone was disconnected.

23          Davis, however, contends that there was an insufficient showing of diligence on the

24   state's part to secure Alexander's attendance at trial, and therefore the state court's

25   determination that Alexander was unavailable was unreasonable.

26          The state appellate court affirmed the trial court's determination that Alexander was

27   unavailable based on the state evidence code and California case law.  California Evidence

28   Code § 240 defines an "unavailable" witness as one who is "[a]bsent from the hearing and

                                               20

United States District Court

For the Northern District of California

the proponent of his or her statement has exercised reasonable diligence but has been

unable to procure his or her attendance by the court's process." *See* § 240 (a)(5).  The

California Court of Appeal then noted that there was a split among the state appellate

courts regarding the appropriate standard of review for a trial court's determination of

unavailability.  Applying both standards, including an abuse of discretion and an

independent review standard, the state appellate court affirmed.  It concluded that, "looking

at the totality of the circumstances, it is reasonable to believe further efforts would not have

led to Alexander testifying at trial.  The prosecution was not required to waste time and

resources in a pointless effort to secure Alexander's attendance at trial. . . ."

Under federal law, to demonstrate that a witness is "unavailable" requires that the

prosecutor make a good faith effort to obtain the witness' presence.  *See Barber v. Page*,

390 U.S. 719, 724-25 (1968); *United States v. Olafson*, 213 F.3d 435, 441-42 (9th Cir.

2000) (good faith effort demonstrated where border patrol agents called witness, who had

been inadvertently returned to Mexico, but witness refused to return to testify); *Windham v.

Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith effort to locate

witness where he subpoenaed witness, met with witness to discuss proposed testimony

after issuing subpoena, tried to call witness three times as trial date approached, contacted

witness' parole officer, had a bench warrant issued for witness' arrest, and assigned a

criminal investigator to locate witness).  Given the prosecution's numerous attempts - more

than a dozen - to secure Alexander's appearance at trial, the court concludes that it was

reasonable for the state appellate court to find that the prosecution was sufficiently diligent

and acted in good faith.

### b.    Reliability

The court also finds that the state court's reliability determination regarding

Alexander's statements to Sanford while she was in the hospital, made only several hours

after the incident, was reasonable.  At the time that Alexander made the statements, she

was lying down on a gurney, and was in transit from the trauma unit.  Given the fact that

Alexander had just suffered a serious head wound, resulting in depression of her skull, it is

21

United States District Court

For the Northern District of California

1   unlikely that she was in a condition that allowed for significant fabrication.  Additionally, the

2   fact that Alexander openly admitted to Sanford that she wielded a knife, with which she

3   threatened Davis, suggests that she was honest regarding her role in the incident.  Given

4   the totality of the circumstances, there was a sufficiently "particularized guarantee[] of

5   trustworthiness," such that the state court's conclusion was reasonable.

6               **D.     California Evidence Code Section 1240 Claims**

7       In addition to admitting Alexander's statements to Sergeant Sanford, the trial court

8   also admitted an additional out-of-court statement that Alexander made to Officer Salazar

9   and two out-of-court statements made by her mother, including a 911 call and a statement

10  to Officer Salazar.  The state court admitted them as spontaneous statements pursuant to

11  California Evidence Code § 1240, which allows for admission of statements that "purport[]

12  to narrate, describe, or explain an act condition, or event perceived by the declarant," and

13  that were "made spontaneously while the declarant was under the stress of excitement

14  caused by such perception."

15      The legal standards for evaluating these Confrontation Clause claims are the same

16  as those described above with respect to the statements admitted pursuant to § 1370.

17              **i.     Alexander's Statement to Officer Salazar**

18      As noted, Officer Salazar testified that when he arrived at the scene shortly after

19  notification regarding the 911 call, Alexander was lying face down in a pool of blood on the

20  living room floor.  He stated that she was "fading in and out," although she never completely

21  lost consciousness and was able to respond to Salazar's questions.

22      When Officer Salazar asked Alexander what had happened, she responded that her

23  boyfriend hit her with a hammer.  She stated that her boyfriend was the petitioner, Anthony

24  Davis.  Alexander also told Salazar that right before hitting her with the hammer, Davis

25  stated, "All right, bitch, I got something for you."

26      On appeal, the appellate court held that the trial court did not err in admitting the

27  statements because the record demonstrated that Alexander made them without

28  deliberation or reflection, and that they were sufficiently spontaneous and trustworthy.

**United States District Court**
For the Northern District of California

1    The analysis of this issue is similar to that set forth above with respect to Alexander's

2   statements to Sergeant Sanford, admitted pursuant to § 1370.  In terms of reliability,

3   Alexander's statements to Salazar, made immediately following the assault, while

4   Alexander was still under the stress of the event, were likewise made under circumstances

5   "that provide[d] substantial guarantees of their trustworthiness"  and "without the

6   opportunity to reflect on the consequences of [Alexander's] exclamation." *White*, 502 U.S.

7   at 355-56 & n.8.  The state appellate court's conclusion was not unreasonable.

8    The court notes, however, that contrary to California Evidence Code § 1370, § 1240

9   *does not* require the declarant's unavailability; accordingly, the state courts did not analyze

10   Alexander's unavailability.  Again, as was the case above, because the statements were

11   not made in the course of a prior judicial proceeding, the absence of such inquiry was not

12   contrary to clearly established Supreme Court law because it was not required for

13   Confrontation Clause analysis.  *See White*, 502 U.S. at 741.  However, even if unavailability

14   was required, for the same reasons as discussed above, review of the record sufficiently

15   demonstrates Alexander's unavailability.

16              **ii.    Persons' 911 Phone Call and Statements to Officer Salazar**

17    Persons made the 911 call seeking emergency medical attention for her daughter.

18   At the time she called 911, she was hysterical and frantically sought medical help for her

19   seriously injured daughter.  During the course of the 911 call, Persons stated that Davis hit

20   Alexander in the head with a hammer, and that Alexander was bleeding profusely.

21    The trial court permitted the prosecution to place the 911 tape into evidence as a

22   spontaneous statement under California Evidence Code § 1240.  The trial court also

23   permitted the prosecution to question Officer Salazar regarding Persons' statements to him

24   at the scene of the crime pursuant to that same section.

25    Salazar testified that at the scene, approximately ten minutes after his arrival,

26   Persons advised him that she was upstairs when she heard Davis and Alexander arguing.

27   Subsequently, she heard what sounded like a slap and then heard her daughter scream to

28   her to call the police.  Persons then went downstairs and saw Davis and Alexander arguing,

United States District Court
For the Northern District of California

and attempted to separate them.  Davis pushed Alexander, and she fell onto the couch.
Davis then struck Alexander in the head with a hammer, and fled.

Citing state law only, the appellate court held that admission of Persons' statements
did not violate Davis' Confrontation Clause rights because the statements were admitted
pursuant to a "firmly rooted hearsay exception for spontaneous declarations."  The court
held that Persons' statements were sufficiently spontaneous because they were "made [to]
the first person in whom [Persons] could confide and at the first opportunity."  It rejected
Davis' suggestion that Persons was not under sufficient stress or in a state of excitement,
noting that even though Persons may not have appeared "overly emotional," she had just
witnessed a brutal attack on her daughter who was in a lot of pain and going in and out of
consciousness.  It further held that Persons had sufficient personal knowledge of the attack
on Alexander, and "was in a position to witness the brutal attack."  Again, as was the case
with Alexander's statements admitted under § 1240, the appellate court did not analyze
Persons' unavailability because that was not a requirement under the statute.

Turning to Persons' statements to Salazar and those made in the course of her 911
call, the legal standards are identical to those set forth above.  Because Persons'
statements were not made in the course of a prior judicial proceeding, her unavailability
was not required for purposes of the Confrontation Clause.[3]  Additionally, because the
statements were admitted as excited utterances, which the Supreme Court has recognized
constitutes a "firmly rooted" hearsay exception, they were sufficiently reliable.  Based on the
record before it, the court concludes that the California Court of Appeal's determinations
that Persons' statements to the 911 operator and to Salazar were indeed spontaneous,

---

[3]The court is unable to analyze Persons' unavailability as it did with respect to Alexander
because the parties have not raised or addressed this issue.  However, based on the record
before it, it does appear that Persons, unlike Alexander, was available to testify at trial.  In fact,
the state notes in its opposition brief that Persons appeared in chambers on the first day of
trial.  *See* Oppos. at 24 (citing July 13, 1998 R.T.).

1    based on personal knowledge, and made under duress, were reasonable.[4]

2    **E.    Trial Court's Denial of Davis' First Motion for a New Trial**

3    Davis also contends that newly discovered evidence presented at his motion for a

4    new trial confirmed a violation of his Confrontation Clause rights.

5    After trial, Davis moved for a new trial pursuant to California Penal Code section

6    1181 on four grounds, including: (1) that newly discovered evidence showed that Alexander

7    and her mother contrived to misrepresent what happened in order to protect Alexander

8    from criminal charges, and their statements to the police were, therefore, inadmissible as

9    spontaneous statements; (2) for the same reasons, Alexander's statement to Sanford was

10   not trustworthy and was inadmissible under California Evidence Code section 1370 and the

11   Confrontation Clause; (3) the trial court erred as a matter of law in finding Alexander

12   unavailable as a witness; and (4) the jury verdict was not supported by the evidence.  In the

13   instant federal petition, Davis challenges the state court's denial of his motion for new trial

14   on the first three grounds only.

15   In support of his motion for a new trial, Davis presented the testimony of Alexander

16   and Persons.  Persons testified at the hearing on the motion that contrary to her statements

17   to Officer Salazar, as testified to by Officer Salazar, and on the audiotape of her 911 call,

18   she did not actually observe Davis hit Alexander with the hammer.  She testified, instead,

19   _____

20   [4]The court reiterates that given the Supreme Court's recent decision in *Bockting*, 127 S.
     Ct. 1173, in which the Court held that *Crawford* does not apply retroactively, it is following pre-
21   *Crawford* law governing analysis of Confrontation Clause claims.  This includes the analysis
     as it pertains to admission of the 911 call statements. The court acknowledges that  in *Davis*
22   *v. Washington*, a case involving the admission of 911 call transcripts, the Supreme Court
     elaborated on its holding in *Crawford.*  126 S.Ct. 2266 (2006).  In *Davis*, the Court addressed
23   a statement made by a woman to a 911 operator reporting she had been assaulted. 126 S.Ct.
     at 2270-71. That recorded statement was later used at trial to prosecute Davis (the woman's
24   former boyfriend) for a felony violation of a domestic no-contact order. *Id.* at 2271. The Court
     considered the 911 operator's questioning of the woman to be an interrogation, *id.* at 2274 n.
25   1, and the operators themselves to be at least "agents of law enforcement," *id.* at 2274 n. 2.
      In the face of the *Davis* defendant's objection that introduction of the statement violated the
26   Sixth Amendment, the Court held that when the objective circumstances indicate the "primary
     purpose" of police interrogation is to meet an ongoing emergency, the statements elicited in
27   response are nontestimonial, and are not subject to the requirements set forth in *Crawford.*
     *Id.* at 2273-74. However, because *Davis* was decided after *Crawford*, it is not applicable to this
28   case.

United States District Court

For the Northern District of California

1   that Alexander told her that Davis hit her in the head with the hammer, and advised

2   Persons to lie to the police that she had observed it.  Persons attested that she lied to

3   Officer Salazar at the scene and during the 911 call because she was mad at Davis since

4   he had been drinking.

5         Persons admitted that she was testifying at the hearing on Davis' motion for a new

6   trial because she wanted to help him get out of jail.  She also admitted that she was

7   "panicked" and "scared" at the time she made the 911 call because her daughter was laying

8   in a pool of blood, and stated that she did not remember what she had said on the 911 call.

9         Alexander also testified at the motion hearing that she advised her mother what to

10  tell the police.  Alexander testified that she charged Davis with a knife prior to him

11  "accidentally" hitting her in the head with a hammer.  She asserted that she wanted her

12  mother to lie about her role in the incident because she was mad at Davis as a result of her

13  head injury.

14        The trial court denied Davis' motion for a new trial on all four bases, including the

15  three at issue in the instant petition.  First, the court denied Davis' motion on the basis of

16  alleged new evidence.  In characterizing Davis' argument, the trial court noted that he

17  contended that Alexander and Persons "because of their complicity and the way they

18  contrived the utterances that were introduced as spontaneous declarations, under the

19  hearsay evidence exception of spontaneous utterances, could not have been

20  [spontaneous] because they were contrived. . . [and] based upon . . . calculation and

21  planning . . . to falsify the nature of the report they were making."  R.T. 311.

22        The trial court determined that Alexander and Persons' testimony regarding their

23  alleged collusion and falsification of their statements to the police was not really "newly

24  discovered" evidence.  R.T. 311-12.  It concluded instead that the jury had heard everything

25  that it needed to in order to evaluate the credibility and alleged spontaneous nature of the

26  women's statements to the police.  *Id.* at 312.  It noted that the jury heard not only the

27  officers' testimony regarding the women's statements and the 911 tape, but also "heard

28  from Mr. Nigel Phillips [the defense investigator] that prior to the trial, [] Alexander had

1    indicated that she was the aggressor in the assault, and that [Davis] essentially engaged in

2    an act of self defense . . . and that essentially, [Alexander] recanted." *Id.* at 311.  The trial

3    court further noted other evidence before the jury concerning Alexander's inconsistent

4    stories and her subsequent recantation, including the fact that Alexander had, after the

5    incident, married Davis and was still in contact with him.

6         Additionally, the trial court found that Alexander's and Persons' testimony at the

7    motion hearing was "less than credible." *Id.* at 312.  Credibility aside, however, the trial

8    court ruled that "nevertheless, the gist of the spontaneous utterance and [Alexander's]

9    declaration before the trial court to Mr. Phillips recanting was sufficient for the jury to

10    assess all issues of credibility regarding statements." *Id.*

11         The trial court also denied Davis' motion on the grounds that the new evidence

12    called into question the Sanford's testimony regarding Alexander's statements, admitted

13    pursuant to California Evidence code section 1370.  *Id.* at 314-15.  It further upheld its

14    original ruling that, as a matter of law, Alexander was "unavailable," allowing admission of

15    the statements pursuant to section 1370.

16         On direct appeal to the California Court of Appeal, Davis did not challenge the trial

17    court's ruling on his first motion for new trial on constitutional grounds.  Instead, he claimed

18    only that the trial court abused its discretion in denying his motion.  Accordingly, the

19    appellate court ruled only on those grounds, concluding that the record did not "support a

20    finding of manifest and unmistakable abuse of discretion."  In affirming the trial court, it

21    held:

22         The evidence proffered by Davis was hardly 'newly discovered' after trial.
         Because defense counsel knew of Persons and Alexander and of their
23         change of heart with respect to what they originally told the police prior to the
         close of trial, the evidence could not be considered newly discovered.  Both
24         Alexander and Persons had been living in San Francisco during the court
         proceeding, yet they waited until after the verdict to offer their testimony.  The
25         court was entirely justified in its conclusion that Alexander and Persons'
         potential testimony was not newly discovered.
26

27    Moreover, the appellate court concluded that "[g]iven the fact that the proffered evidence

28    could not negate the medical evidence presented at trial as well as the court's doubts about

United States District Court

For the Northern District of California

1   the witnesses' credibility, the trial court acted within its discretion in denying the motion for a
2   new trial."

3         However, Davis did raise the instant constitutional claim with respect to the trial
4   court's denial of his motion for a new trial in his petition for review before the California
5   Supreme Court, which the court summarily denied.  Specifically, Davis claimed that "newly
6   discovered evidence confirms violation of petitioner's confrontation right by the admission of
7   Alexander's and Persons' hearsay statements."

8         Respondent contends that Davis has not stated a claim cognizable on federal
9   habeas review.  Respondent is correct that federal habeas relief is unavailable for
10  violations of state law or for alleged error in the interpretation or application of state law.
11  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Federal courts generally are bound by
12  a state court's construction of state laws, including the denial of a motion for new trial under
13  state law, unless the petitioner can show an *independent violation of his federal*
14  *constitutional rights.   See, e.g., Melugin v. Hames,* 38 F.3d 1478, 1487 (9th Cir. 1994)
15  (federal court bound by Alaska Court of Appeals' interpretation and decision that state
16  statute was properly applied to petitioner's conduct); *see also Moore v. Casperson*, 345
17  F.3d 474, 482 (7th Cir. 2003) (petitioner who challenged trial court's failure to grant him a
18  new trial based on newly discovered evidence must demonstrate underlying constitutional
19  violation); *Coleman v. Newland*, 2001 WL 725388 at *7 (N.D. Cal. 2001) (petitioner must
20  identify federal constitutional right violated by trial court's denial of motion for new trial
21  based on new evidence).

22        Davis' argument that the trial court's denial of the new trial confirms violation of his
23  confrontation rights has already been addressed by this court in the context of the
24  discussion of his other Confrontation Clause claims discussed above.  He presents no new
25  arguments or legal authority in support of his contention that the denial of a new trial
26  violated his Sixth Amendment rights.  Moreover, to the extent that Davis is claiming that his
27  due process rights were violated by the trial court's denial of his motion for a new trial, it is
28  without merit.  *See, e.g, Moore*, 345 F.3d at 482 (treating petitioner's similar challenge as

United States District Court

For the Northern District of California

one alleging a violation of due process).  The state court's determination that Alexander's and Persons' testimony did not constitute "newly discovered" evidence was reasonable and supported by the record, which clearly reveals that the jury heard and considered sufficient evidence regarding Alexander's subsequent recantations and assertion that Davis assaulted her in self-defense.

**III.    Cumulative Error**

Finally, Davis asserts that the cumulative effect of errors warrant reversal.  "Cumulative error applies where although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  *Mancuso v. Oliverez*, 292 F.3d 939, 957 (9th Cir. 2002).

Because there was no single constitutional error in this case, there can be no cumulative effect.

**CONCLUSION**

For the reasons set forth above, Davis' petition for writ of habeas corpus is DENIED because the appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented.  This order fully adjudicates the motion listed at No. 1 of the clerk's docket for this case and terminates all other pending motions.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: August 2, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge